UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MARK EDWARD IMMEKUS, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | No. 4:14 CV 404 DDN |
| ) | |
| JAY CASSADY, ) | |
| ) | |
| Respondent. ) | |

## MEMORANDUM

This action is before the court upon the petition of Missouri state prisoner Mark Edward Immekus for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the petition for a writ of habeas corpus is denied.

## I. BACKGROUND

On November 18, 1998, a Circuit Court of Pulaski County jury found petitioner Immekus guilty of first degree assault, armed criminal action, and felonious restraint. On December 18, 1998, the court sentenced him to consecutive terms of life, twenty years, and ten years imprisonment, respectively. On August 31, 2000, the Missouri Court of Appeals affirmed his conviction but remanded the case to the trial court for resentencing on the first degree assault conviction. *State v. Immekus,* 28 S.W.3d 421 (Mo. Ct. App. 2000). On November 8, 2000, the Circuit Court of Pulaski County changed petitioner's first degree assault sentence to thirty years imprisonment. On November 20, 2000, petitioner appealed to the Missouri Court of Appeals. On September 18, 2001, the Missouri Court of Appeals affirmed the judgment of the trial court. *State v. Immekus*, 55 S.W.3d 866 (Mo. Ct. App. 2001).

On January 25, 2001, petitioner filed in the circuit court a pro se motion for post-conviction relief under Missouri Supreme Court Rule 29.15. On March 7, 2012, petitioner,

through the aid of counsel, amended his motion. The circuit court denied petitioner's motion on July 18, 2012. On August 6, 2013, the Missouri Court of Appeals affirmed the denial. *Immekus v. State*, 410 S.W.3d 678 (Mo. Ct. App. 2013).

On March 3, 2014, petitioner filed the instant petition for a writ of habeas corpus under 28 U.S.C. § 2254.

The Missouri Court of Appeals described the facts, viewed in the light most favorable to the verdict, as follows:

> [Petitioner] had dated Saveda Bollinger ("Victim") before leaving the state, after which she started dating Mike McQueen ("McQueen"). On October 3, 1996, [petitioner] returned to Missouri, and Victim and McQueen took him to Victim's home to get clothes and belongings that he had left there before leaving the state. After doing so, Victim and McQueen took [petitioner] to a motel in Rolla where Victim rented a room for [petitioner] to spend the night. That evening, [petitioner] called Victim and told her that he had taken pills from her home and that if she did not come alone to the motel to see him, he would attempt suicide by taking them.
>
> Victim and McQueen started for the motel, but Victim dropped McQueen off at a grocery store and told him to walk to the motel. She instructed McQueen that if she was not outside when he arrived at the motel, it meant she was having trouble and he should come to the door. When [petitioner] answered Victim's knock on the door, he threw her to the floor, hit her in the face, and pulled her by her hair to a chair where he tied her up with a cord. [Petitioner] proceeded to hit Victim in the face several times, cut her face with a single-edged razor, cut her hair to a length of 1 ½ inches (it had come to the middle of her back), cut the back of her head, and shaved her eyebrows off. While he was doing these things, he told Victim that he was going to make her "as ugly as her boyfriend," and he put a mirror in front of her, saying, "Aren't you pretty now?" At one point, [petitioner] told her that if she thought she had been beaten, "now you're going to be beat," and also said, "Dead time, bitch." In addition to hitting her in the face, [petitioner] also ripped off Victim's pants, tearing the buttons on the fly off, and kicked her in the lower part of the stomach with his cowboy boots. [Petitioner] used a tape recorder he had taken from Victim's house to record some of his comments about what he had done to her and what he intended to do, including that he intended to inject her with methamphetamine. He also told her that his friend, Rick Fisher, was going to arrive and rape her.
>
> The motel clerk's office was directly beneath the room that Victim had rented for [petitioner]. The clerk heard loud banging coming from that room and thought they were tearing up the room. She called the room and told [petitioner] that he was going to have to curtail their activities because she didn't want the room torn up, and he said "Okay." McQueen then arrived at the motel and asked the clerk to call the room after he got no answer by knocking on the door to see if

Victim was ready to go.  The clerk called [petitioner] again and asked to speak to Victim.  [Petitioner] gave the phone to Victim who told the clerk, "Oh, help me, please God . . ."  The clerk then called 911.

At some point Rick Fisher arrived at the room but, although he was acquainted with Victim, he did not recognize her because of her condition.  At that time, Victim was still bound in the chair and was bleeding from her wounds.  Fisher said, "I don't need this, I'm leaving," and [petitioner] said he was going with him.  [Petitioner] untied Victim and threw her clothes at her.  As soon as Victim could get her clothes on, she left the room and ran downstairs.  Fisher then left the motel room and got in his car.  [Petitioner] followed Fisher out and got in the car with him and they left.  The police and an ambulance arrived at the motel shortly after they left.  Some officers left the scene to look for [petitioner] and Fisher, and one or more officers went to the room to see if anyone else was there.  They entered the room through the door which [petitioner] left open and saw the room in disarray, hair on the floor, a chair with a cord tied around the arms, and blood on the wall behind the chair.  Word shortly came that Fisher's car had been stopped, and the officers in the room left to assist in the arrest, pulling the motel room door shut resulting in it being locked.

Victim was taken to the hospital where she was found to have severely swollen eyes, cuts on both cheeks, a cut on the back of her head, and cut-off hair.  The physician who examined her had to hold her eyes open in order to examine them because of the swelling.  Although Victim was not kept in the hospital overnight, she came back the next day for a CT scan that revealed a fracture of the left orbital floor (underneath the eye in the cavity that the eye sits in).  The risks of a fractured orbital floor include the possibility of paralysis of the eye by trapping the optic nerve, and of infection.  She also had a loose front tooth that was cracked and eventually fell out.

*State v. Immekus*, 28 S.W.3d at 424-25.

## II.  PETITIONER'S GROUNDS FOR FEDERAL HABEAS RELIEF

Petitioner alleges two grounds for relief in this habeas action:

(1) His trial counsel rendered constitutionally ineffective assistance by failing to request a jury instruction for the lesser included offense of assault in the second degree.

(2) His trial counsel rendered constitutionally ineffective assistance by failing to move for the suppression of the evidence obtained as a result of the motel room search.

Respondent contends that Grounds 1 and 2 are without merit. Respondent further contends that Ground 2 is procedurally barred because petitioner did not raise this claim on post-conviction appeal and petitioner does not allege any specific failing by trial or appellate counsel.

### III.  EXHAUSTION AND PROCEDURAL BAR

Congress requires that state prisoners exhaust their state law remedies for claims made in federal habeas corpus petitions filed in district court. *See* 28 U.S.C. § 2254(b)(1)(A). A state prisoner has not exhausted his remedies "if he has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c).

Exhaustion of remedies in the sense that petitioner now merely has no remaining procedure for bringing a claim to the state court does not satisfy the federal statutory requirement. *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam). A petitioner must have fairly presented the substance of each federal ground to the state trial and appellate courts. *Id.* If he has not done so and he has no remaining state procedure available for doing so, any such ground for federal habeas relief generally is barred from being considered by the federal courts. *Grass v. Reitz*, 643 F.3d 579, 584 (8th Cir. 2011); *King v. Kemna*, 266 F.3d 816, 821 (8th Cir. 2001) (en banc). The doctrine of procedural bar applies whether the default occurred at trial, on appeal, or during state court collateral attack. *See Murray v. Carrier*, 477 U.S. 478, 490–92 (1986).

A petitioner may avoid the procedural bar by demonstrating either that there is a legally sufficient cause for the default and actual prejudice resulting from it, or that failure to review the claim would result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). To establish cause for a procedural default, petitioner must demonstrate that some objective factor external to his case impeded his efforts to comply with the state procedural requirements. *Id.* at 753. "Only where a prisoner is impeded or obstructed in complying with the State's established procedures" will the court entertain waiving a violation of the procedures. *Martinez v. Ryan*, 132 S. Ct. 1309, 1318 (2012). To establish actual prejudice, petitioner must demonstrate that the alleged errors "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Ivy v. Caspari*, 173 F.3d 1136, 1141 (8th Cir. 1999) (internal citations omitted); *see also Charron v. Gammon*, 69 F.3d 851, 858 (8th Cir. 1995) (stating that the standard of prejudice to overcome procedural default "is higher than that

required to establish ineffective assistance of counsel under *Strickland*") (citing *Strickland v. Washington*, 466 U.S. 668 (1984)).

Petitioner raised Ground 1 in his amended post-conviction relief petition and appeal to the Missouri Court of Appeals. (ECF No. 7, Ex. P at 27, 61; Ex. Q at 14, 16.) Accordingly, Ground 1 is not procedurally barred. However, petitioner has not raised Ground 2 in any previous motion or filing in Missouri state court. Accordingly, Ground 2 is procedurally barred. Petitioner has not presented any legally sufficient reason why he failed to raise Ground 2 and he has failed to show that this court's failure to consider Ground 2 would result in a miscarriage of justice.

Nevertheless, Congress has authorized federal courts to dismiss procedurally barred grounds if a court concludes that the grounds are without merit. 28 U.S.C. § 2254(b)(2). The undersigned has considered all of petitioner's federal grounds on their merits.

### IV. STANDARD OF REVIEW

For petitioner's Ground 1, which was adjudicated by the Missouri courts, the federal Antiterrorism and Effective Death Penalty Act (AEDPA) requires that habeas relief may not be granted by a federal court on a claim that has been decided on the merits by a state court unless that adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

A state court's decision is contrary to clearly established federal law if it "arrives at a conclusion opposite to that reached by [the] Court on a question of law or . . . decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Thaler v. Haynes*, 130 S. Ct. 1171, 1174 (2010) (per curiam) (citation omitted). This standard is difficult to meet because habeas corpus "is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (citation omitted). A state court's decision involves an "unreasonable

application" of clearly established federal law if "the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Thaler*, 130 S. Ct. at 1174.

A state court's factual findings are presumed to be correct. 28 U.S.C. § 2254(e)(1); *Wood v. Allen*, 130 S. Ct. 841, 845 (2010). Review under § 2254(d)(1) is limited to the record before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). Clear and convincing evidence that factual findings lack evidentiary support is required to grant habeas relief. 28 U.S.C. § 2254(e)(1); *Wood,* 130 S. Ct. at 845.

For petitioner's Ground 2, which was not adjudicated on the merits by a state court, the pre-AEDPA standard for habeas review governs. *Gingras v. Weber*, 543 F.3d 1001, 1003 (8th Cir. 2008) ("Because [petitioner's] apparently unexhausted claim was not adjudicated on the merits, we likely should apply the pre-AEDPA standard of review, rather than the deferential standard of 28 U.S.C. § 2254(d).") (internal citations and quotations omitted); *Montes v. Trombley*, 599 F.3d 490, 495 (6th Cir. 2010). Under the pre-AEDPA standard, the habeas petitioner must show a "reasonable probability that the error complained of affected the outcome of the trial, or that the verdict likely would have been different absent the now-challenged [defect]." *Robinson v. Crist*, 278 F.3d 862, 865-66 (8th Cir. 2002).

## V. DISCUSSION

### A. Ground 1

In Ground 1, petitioner alleges that his trial counsel rendered constitutionally ineffective assistance by not requesting the trial court give a jury instruction for the lesser included offense of second degree assault.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court determined that the right to effective assistance of counsel arises from the Sixth and Fourteenth Amendments. Under *Strickland*, a petitioner is entitled to federal habeas corpus relief upon a showing that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

Petitioner must prove two elements to prevail on a claim of ineffective assistance of counsel. First, petitioner must demonstrate that counsel's performance fell below an objective standard of reasonableness. *Id.* at 687–88. There is a strong presumption that counsel has

rendered constitutionally effective assistance. *Id.* at 690; *Blackmon v. White*, 825 F.2d 1263, 1265 (8th Cir. 1987). Counsel's strategic choices made after thorough investigation are virtually unchallengeable. *Strickland*, 466 U.S. at 690–91. Additionally, decisions following reasonable, but less thorough, investigation are to be upheld to the extent that they are supported by reasonable judgment. *Id.* Second, petitioner must demonstrate actual prejudice by counsel's deficient performance. *Id.* at 687. "[A] court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Id.* at 696.

Although petitioner's counsel did not request an instruction for second degree assault, the jury received an instruction for third degree assault. (ECF No. 7, Ex. E at 122.) At the post-conviction evidentiary hearing, petitioner's trial counsel testified that he declined to request an instruction on second degree assault because he believed that the victim's injuries did not rise to the level required for first degree assault and that offering the instruction for third degree assault would allow the jury to compromise between finding petitioner not guilty and finding petitioner guilty of first degree assault. (*Id.*, Ex. O at 53.) Furthermore, trial counsel testified that he did not want to allow the jury to have second degree assault as a choice in order to persuade the jury to convict him of third degree assault. (*Id.*) The Missouri Court of Appeals found this strategy reasonable. *Immekus v. State*, 410 S.W.3d at 684.

Considering the aforementioned testimony and the facts of the underlying case, the court cannot conclude that the state court unreasonably applied the *Strickland* principles when it found the trial counsel's actions reasonable. Accordingly, Ground 1 is without merit.

**B. Ground 2**

In Ground 2, petitioner argues that his trial counsel rendered constitutionally ineffective assistance by not properly presenting his motion to suppress evidence stemming from the search of his motel room. Specifically, he argues, "[i]n the instant case it is essentially uncontested that the motel clerk opened the door for a warrantless search--a presumptively unreasonable act calling for habeas relief." (ECF No. 1 at 26.)

The Rolla Police Department searched the room at the Rustic Motel and discovered, among other things, a razor blade used to cut the victim's face, an empty hypodermic needle, and a microcassette recording of petitioner detailing his assault of the victim. (ECF No. 1 at 7, 24-

26.) After a pretrial evidentiary hearing, the circuit court denied the motions. (ECF No. 7, Ex. B, at 104-06.)

On direct appeal, the Missouri Court of Appeals affirmed the denial of the suppression motions, discussing the issues thus:

> In his third point, Defendant claims trial court error in its failure to suppress a tape recording seized from the motel room, and in overruling his objections when the tape was offered in evidence and played for the jury. In support, he contends that the audiotape was seized as the result of a warrantless, unreasonable search of the motel room.
>
> The tape contains statements by Defendant that he had "cut her hair, kicked the f —— out of her, busted her face up, it's just the beginning, I'm going to inject her full of methamphetamine . . . I want this all documented on what I'm doing to her, I'm enjoying the f—— out of this, this has been coming for a long time, you're a no good . . . piece of s—— stupid slut who f—— with the wrong one, I'd go to prison for the rest of my life, I'd be happy as f——looking at you because now you been beat."
>
> In his motion to suppress, Defendant contended that the tape was illegally seized from the motel room as a result of a search which was without a warrant, without probable cause, and which did not come within the scope of any exception to the requirement that a warrant be obtained. He also alleged that while the motel room was rented for him, he did not consent to the search; the search was not incident to a lawful arrest; there was no evidence that the tape had been used or was about to be used in any way upon which "this criminal charge could arise"; the tape was not in plain view; and the seizing officers were not at a place where they had a legal right to be.
>
> When the officers arrived at the motel, they found Victim sitting on the curb crying, bruised and bleeding. Although her testimony was less than succinct, Victim testified that she believed that one of the officers asked her permission to go into the motel room, and that she had no objection to them doing so. When the officers went to the room to see if anyone was still there, they found the door open, and upon looking in, they saw hair on the floor by a chair, blood on the wall by the chair, and cords tied to the chair arms. They then received word that suspects in the case were being stopped, and they left to assist in the arrest, pulling the door shut (thereby locking it). After Defendant and Fisher were arrested, the motel clerk let two officers in, using her key. The officers searched the room and seized several items including the tape that is the subject of this point on appeal. At trial, the portion of the tape made during the time Defendant had Victim in the motel room was played for the jury.

\*\*\*

> A warrantless search is presumptively invalid under the United States Constitution, and it is the State's burden to prove justification for such a search upon a defendant's motion to suppress. "Generally, a seizure without probable cause and without the authority of a warrant is reasonable only to the extent that the government's interest in conducting the search and seizure outweighs the individual's reasonable expectation of privacy." "To receive the protection of the Fourth Amendment, an individual must have an actual subjective expectation of privacy in the place being searched and that expectation must be reasonable." "Where an individual has voluntarily given up control of his property, courts have found that the individual has relinquished any legitimate expectation of privacy in that item." Thus, when a party abandons property he no longer has a reasonable expectation of privacy with regard to it at the time of a search or seizure.
>
> A person has no standing to complain of the search or seizure of property that he has voluntarily discarded, left behind, or otherwise relinquished his interest so that he no longer retains a reasonable expectation of privacy with regard to it at the time of the search or seizure. An abandonment is primarily a question of intent and all relevant circumstances existing at the time of the alleged abandonment should be considered. "Where an item is discarded in connection with flight from the law, protection against governmental intrusion upon that item is neither a 'reasonable' nor a 'legitimate' expectation."
>
> In the instant case, after Fisher arrived and told Defendant that "I don't need this" and "I'm leaving," Defendant then allowed Victim to leave the room after untying her hands and giving her clothes back. Fisher then left the room and started his car. He was followed by Defendant who left the motel room door open and got in the car with Fisher. They were apprehended after leaving the scene.
>
> Here, the evidence supports a finding that Defendant abandoned the motel room and all that was in it when, after releasing Victim, he left the motel. This is fortified by the fact that he left the motel room door open to the world when he departed, and the fact that, having released Victim in a beaten and bloody condition, it is reasonable to believe that he could expect the police to be arriving shortly and that he was attempting to avoid capture. He certainly could expect that either the clerk or the police would investigate the contents of the open room where a crime had obviously been committed. Accordingly, the trial court did not err in overruling the portion of Defendant's motion to suppress referred to in this point. The point is denied.

*State v. Immekus*, 28 S.W.3d at 428-30 (internal citations omitted).

On his Ground 2 claim, petitioner must prove that his "Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986).

Petitioner's Fourth Amendment evidence suppression claim is not meritorious. The Fourth Amendment's bar on unreasonable searches does not protect people in places where they have no reasonable expectation of privacy. *Minnesota v. Carter*, 525 U.S. 83, 88–91 (1998). The Eight Circuit has consistently held that "[w]hether a defendant has a reasonable expectation of privacy in a motel room depends upon factors such as whether he checked into or paid for the room and whether he had the ability to control or exclude others' use of the room." *United States v. Walton*, 188 F. App'x 531, 533 (8th Cir. 2006); *United States v. Carter*, 854 F.2d 1102, 1105-06 (8th Cir. 1988). Petitioner's victim paid for the room so that petitioner might be able to spend the night there. (ECF No. 7, Ex. B at 10, 15.) Petitioner relies on *Stoner v. California*, in which only the clerk consented to the search, and the Supreme Court of the United States found the search unconstitutional because of the lack of reasonably authoritative consent. 376 U.S. 483, 489 (1964). Here, however, the victim consented to the search of petitioner's room because she paid for the room and registered it under her name. (ECF No. 7, Ex. B at 11-12, 15, Ex. C at 287, Ex. D at 562.) Furthermore, "when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974). Because the victim had common authority over the premises searched by the police and consented to the search, the search was not constitutionally unreasonable.

Additionally, as set forth above, even if petitioner's Fourth Amendment suppression claim was meritorious, petitioner would have to prove that his verdict would have been different absent the seized evidence. Absent evidence seized from the motel room, there is sufficient evidence for a jury to convict petitioner of first degree assault. The victim and various doctors testified at trial the victim suffered major injuries, including a broken tooth, facial scarring, and a facial fracture. (ECF No. 7, Ex. C at 394, 400-06, 420-29, Ex. D at 563-586.) An arresting officer also testified about statements petitioner made indicating his guilt. (*Id.*, Ex. C at 370-71.) Therefore, the court concludes that the exclusion of the evidence seized from the motel room would not have had a substantial effect on the jury's verdict.

Accordingly, petitioner's Ground 2 is without merit.

## VI.  CONCLUSION

For the reasons stated above, the petition of Mark Immekus for a writ of habeas corpus is denied.  Petitioner made no substantial showing that he was deprived of a constitutional right.  Therefore, a certificate of appealability is denied.  28 U.S.C. § 2253(c)(2).

An appropriate Judgment Order is issued herewith.


      /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**


Signed on November 28, 2016.